# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

<table>
<tr><td>United States of America<br>v.<br>Juli Mazi<br><br><br><br><br><hr><i>Defendant(s)</i></td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No. 3:21-mj-71156 MAG</td></tr>
</table>

**FILED**

Jul 13 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___June 2021___ in the county of ___Napa___ in the ___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1035 | False Statements Related to Health Care |

This criminal complaint is based on these facts:

See attached affidavit of HHS-OIG Special Agent Victoria Schwarz

☑ Continued on the attached sheet.

Approved as to form: ___/s/___ AUSA William Frentzen

/s/ Victoria Schwarz via telephone
*Complainant's signature*

Victoria Schwarz, Special Agent HHS-OIG
*Printed name and title*

Sworn to before me by telephone.

Date: ___07/13/2021___

*Judge's signature*

City and state: ___San Francisco, CA___

Hon. Alex G. Tse, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

I, Victoria Schwarz, Special Agent with Health and Human Services Office of the Inspector General (HHS-OIG), being duly sworn, do declare and state:

**INTRODUCTION**

1.      I make this affidavit in support of a criminal complaint for Juli Mazi ("MAZI") for one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of false statements relating to health care matters, in violation of 18 U.S.C. § 1035.

2.      I have been employed by the Department of Health and Human Services – Office of Inspector General (HHS – OIG) as a Special Agent since March 2017 and am currently assigned to the San Francisco Regional Office.  In my current assignment, my duties include investigations into allegations of health care fraud throughout Northern California.  I have received, and receive on an ongoing basis, training in the Medicare laws, rules, and regulations, including the Social Security Act (Title 42 of the United States Code), which is the legal foundation of all Medicare laws, rules, and regulations.  I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

3.      The facts in this affidavit come from my personal participation in this investigation, my training and experience, and information obtained from other agents and witnesses.  Statements of individuals are set forth as summaries unless otherwise indicated.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

4.	Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that MAZI has committed wire fraud, in violation of 18 U.S.C. § 1343, and false statements relating to health care matters, in violation of 18 U.S.C. § 1035.

5.	MAZI is a licensed Naturopathic Doctor in the state of California and the Chief Executive Officer and Chief Financial Officer of "Juli Mazi, ND, a Naturopathic Doctor Corporation." The investigation revealed that MAZI engaged in a fraudulent scheme involving the use of interstate wires and made false statements relating to health care matters in connection with offering and selling purported homeoprophylaxis immunizations, and fabricating vaccine record cards in order to falsely make it appear that the customer received government approved or authorized vaccines.[1] As part of the scheme, MAZI offered homeoprophylaxis immunizations for childhood illnesses that she falsely claimed would satisfy the State of California's immunization requirement for California schools, and falsified, fabricated, and altered immunization cards that were submitted by parents to California schools. The investigation revealed that MAZI used the COVID-19 pandemic as an opportunity to expand her pre-existing immunization scheme and capitalize on a national emergency for her own financial gain. MAZI carried out this aspect of her fraudulent scheme by offering and selling homeoprophylaxis immunization pellets, via interstate wire, that she fraudulently claimed in a consensually monitored and recorded telephone call would provide "lifelong immunity to COVID-19." MAZI told customers that the pellets contained a "very minute amount of this [COVID-19] disease" that could result in "infectious symptoms" of COVID-19 or "automatically flag[] the immune system's attention, inducing immunity." In order to encourage customers to purchase her purported COVID-19 homeoprophylaxis immunization

---

[1] Homeoprophylaxis involves the exposure of an individual to dilute amounts of a disease, purportedly to stimulate the immune system and confer immunity.

pellets instead of receiving U.S. Food and Drug Administration ("FDA")-authorized COVID-19 vaccines from medical providers, MAZI exploited disinformation and fear among some members of the public by falsely and fraudulently claiming that the FDA-authorized COVID-19 vaccines contain "toxic ingredients." Based on information obtained from the FDA, MAZI's representations were false and fraudulent because (a) there is no remedy that provides "lifelong immunity" to COVID-19; (b) exposing individuals to COVID-19 to promote an immune response is not an FDA-authorized treatment for COVID-19 and creates risks to their health and safety; and (c) FDA-authorized COVID-19 vaccines are safe and effective for use by the public.

6. Further, in order to further the scheme, and to conceal and disguise the scheme to minimize the risk of detection, MAZI made false statements in regard to health care matters by writing or causing to be written on official U.S. Centers for Disease Control and Prevention ("CDC") COVID-19 Vaccination Record Cards that MAZI had administered a COVID-19 vaccine manufactured by Moderna when in fact she had not. For some customers, MAZI herself filled out the cards, writing her own name and purported Moderna "lot numbers" for a vaccine she had not in fact administered. For other customers, MAZI provided blank CDC COVID-19 Vaccination Record Cards and told each customer to write that MAZI had administered a Moderna vaccine with a specified lot number. In both situations, MAZI instructed customers to write two dates that were one month apart for each purported dose on the cards in order to make it appear they received the Moderna vaccine. MAZI also told customers to "be sure the COVID-19 vaccine is available for your particular population before using that date on the official record." In fact, MAZI did not administer the Moderna vaccine and instead provided customers only with purported homeoprophylaxis immunization pellets. In a consensually monitored and recorded telephone call

made by a member of the public in connection with this investigation, MAZI admitted that her fabrication of the CDC COVID-19 Vaccination Record Cards was "more than an ethical stretch."

7.    In sum, MAZI's false and misleading statements surrounding her purported homeoprophylaxis immunization for COVID-19 and her distribution of falsified CDC COVID-19 Vaccination Record Cards were part of a scheme to commit wire fraud and make materially false documents and writings pertaining to health care matters.

## STATUTORY AUTHORITY

8.    18 U.S.C. § 1343 provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

9.    18 U.S.C. § 1035 provides that "(a) [w]hoever, in any matter involving a health care benefit program, knowingly and willfully— (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both."

10.    The term "health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or

service for which payment may be made under the plan or contract.  18 U.S.C. § 1035(b); 18 U.S.C. § 24(b).

**THE FDA COVID-19 VACCINE EMERGENCY USE AUTHORIZATION PROCESS**

11.     On February 4, 2020, pursuant to Section 564(b)(1)(C) of the Food, Drug, and Cosmetic Act ("FD&C Act") (21 U.S.C. § 360bbb-3(b)(1)(C)), the Secretary of Heath and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States citizens living abroad, and that involves the virus that causes COVID-19.  On the basis of such determination, on March 27, 2020, the Secretary then declared that circumstances existed justifying the authorization of emergency use of drugs and biological products during the COVID-19 pandemic, pursuant to Section 564(b)(1) of the FD&C Act (21 U.S.C. § 360bbb-3(b)(1)).

12.     Based on this declaration and determination, the FDA was permitted to issue an emergency use authorization ("EUA") after it had determined that the following statutory requirements were met (Section 564 of the FD&C Act (21 U.S.C. § 360bbb-3)):

        a.      The chemical, biological, radiological, or nuclear agent referred to in the March 27, 2020 EUA declaration by the Secretary of HHS (COVID-19) can cause a serious or life-threatening disease or condition;

        b.      Based on the totality of scientific evidence available, including data from adequate and well controlled trials, if available, it is reasonable to believe that the product may be effective to prevent, diagnose, or treat such serious or life-threatening disease or condition that can be caused by COVID-19.

c.      The known and potential benefits of the product, when used to diagnose, prevent, or treat the identified serious or life-threatening disease or condition, outweigh the known and potential risks of the product; and

d.      There is no adequate, approved, and available alternative to the product for diagnosing, preventing, or treating the disease or condition.

13.      To date, the FDA has authorized three COVID-19 vaccines for emergency use: (1) Pfizer-BioNTech COVID-19 Vaccine; (2) Moderna COVID-19 Vaccine; and (3) Janssen COVID-19 Vaccine.

**THE CDC COVID-19 VACCINE PROGRAM REQUIREMENTS**

14.      All COVID-19 vaccines in the United States were purchased by the United States Government for administration exclusively by participating providers through the CDC COVID-19 Vaccination Program.  COVID-19 vaccination providers participating in the CDC COVID-19 Vaccination Program are required to sign a CDC COVID-19 Vaccination Program Provider Agreement.  Providers are responsible for adhering to all requirements outlined in the Agreement.

15.      All COVID-19 vaccination providers must report COVID-19 vaccine inventory daily.  COVID-19 vaccination providers must document vaccine administration in their medical record systems within 24 hours of administration, and use their best efforts to report administration data to the relevant system for the jurisdiction (i.e., IIS) as soon as practicable and no later than 72 hours after administration.  After administering a dose of COVID-19 vaccine, vaccination providers are required to record information including the location/facility name/ID, Recipient name and ID, Administration date, CVX (product), Dose number, Lot number, MVX (manufacturer), Vaccine administering provider's name and suffix, and Administering provider's address, if different than the administration address.

16.     All COVID-19 vaccination providers are required to provide patients with an official CDC COVID-19 Vaccination Record Card.  The CDC COVID-19 Vaccination Record Card lists the name of the manufacturer of the COVID-19 vaccine that the patient received, the date the patient received it, the dose numbers, and the location where each dose was administered.

17.     Based on information gathered in this investigation, proof of vaccination as reflected in the CDC COVID-19 Vaccination Record is required to travel to certain locations; attend certain events where large numbers of people congregate, such as sporting events and concerts; and be employed in certain professional activities.  Proof of vaccination requirements are intended to limit the spread of COVID-19.

## INDIVIDUALS AND ENTITIES

18.     MAZI is a licensed Naturopathic Doctor in the state of California.  MAZI completed her undergraduate and master's degrees in communication at the Portland State University.  MAZI went to medical school at the National University of Natural Medicine in Portland, Oregon.  MAZI resides in the Northern District of California and, as described below, operates her medical practice in the Northern District of California.

19.     California Secretary of State Business Entity records show that MAZI initially filed Articles of Incorporation for "Juli Mazi, ND, a Naturopathic Doctor Corporation" on August 13, 2013.  The corporate address was listed as Soquel, CA.  The corporation's most recent Statement of Information, filed on September 4, 2019, lists the address for the Principal Business Office as Napa, CA.  Additionally, MAZI is listed as the Chief Executive Officer and Chief Financial Officer at the same address.  Both addresses mentioned above are located within the Northern District of California.

**STATEMENT OF PROBABLE CAUSE**

**A.     Introduction**

20.     This investigation began as a result of a complaint from a member of the public that MAZI sold purported COVID-19 homeoprophylaxis immunization pellets to members of his/her family, including for use by minor children.  Although the family members did not receive any of the FDA-authorized vaccines, MAZI provided the family with CDC COVID-19 Vaccination Record Cards that falsely stated the family had received the Moderna vaccine.  The initial complaint was subsequently corroborated by other complaints by members of the public, consensual recordings of MAZI's communications with a patient, and documents and information obtained in the investigation.

**B.     Complainant 1**

21.     Complainant 1 made a hotline complaint to the HHS-OIG hotline in or around April 2021.  According to the information received, family members of Complainant 1 purchased purported COVID-19 homeoprophylaxis immunization pellets from MAZI.  According to Complainant 1, the family members told her/him that MAZI stated that the pellets contained the COVID-19 virus and would create an antibody response in the immune system.  Complainant 1 reported that her/his family did not receive injections of any of the three FDA-authorized COVID-19 vaccines.  However, in connection with the delivery of the purported homeoprophylaxis immunization pellets, MAZI sent to Complainant 1's family members COVID-19 Vaccination Record Cards with the Moderna vaccine entered in the field for product name.  MAZI instructed Complainant 1's family members to mark the cards to falsely state that they received the Moderna vaccine on the date that they ingested the purported COVID-19 homeoprophylaxis immunization pellets.

22.     In an interview with this affiant, Complainant 1 stated that her/his family members said they had a virtual meeting with MAZI and then purchased pellets which later arrived in the mail, along with the CDC COVID-19 Vaccination Record Cards.  MAZI told the family members to fill in the date on the card with a date when they were eligible for an FDA-authorized COVID-19 vaccine.  Complainant 1 stated that one family member was not eligible to receive an FDA-authorized COVID-19 vaccine at the time that s/he received the pellets.  None of the family members received an FDA-authorized COVID-19 vaccine at any time—from MAZI or any other source—but MAZI falsified, concealed, and covered up this material fact, and made materially false documents by writing, or causing to be written, on the CDC COVID-19 Vaccination Record Cards that MAZI had administered the Moderna vaccine to the family members.

23.     Complainant 1 provided federal agents with evidence obtained from her/his family members.  The evidence included two CDC COVID-19 Vaccination Record Cards indicating that MAZI administered the Moderna vaccine from lot numbers 042L20A and 030M20A.  Images of the CDC COVID-19 Vaccination Record Cards, which are the false documents charged in Count 2 of this Complaint, are below:



24.     Complainant 1 also provided federal agents with images of a two-page letter that MAZI provided to her/his family members.  The images are displayed below:



# Homeoprophylaxis

Homeoprophylaxis, or HP is the use of homeopathic nosodes to induce immunity. It has a history of over 200 years of very effective and safe use. HP utilizes the same underlying theory as vaccination, where introducing a very minute amount of this disease into the body creates immunity. An important distinction is that the body naturally catches an infective illness by way of the germs entering in through one of the orifices, which automatically triggers the immune system. Vaccines are injected, so they actually require some of their toxic ingredients to grab the attention of the immune system (as we know, many of those toxins are actually immune suppressive). HP is introduced through the oral cavity, which automatically flags the immune system's attention, inducing immunity without the need for any toxic adjuvants.

The COVID-19 homeoprophylactic remedy is labeled Deterreo-US, this is the name of the company that produces the NOVUS-CV or COVID-19 remedy. Four total days of dosing are required, before lifelong immunity is considered achieved. The first 2 days of dosing are of the 200C potency and the last 2 days of dosing are of the 10M potency. The only thing that matters, in terms of timing, is that the person taking a dose of HP is healthy (or not experiencing symptoms of another infectious illness) at the time the dose is taken. Because this is an energy medicine, people can sometimes experience an energetic response, like a mild immune response similar to those symptoms, which the disease might provoke. If this happens, it usually fully resolves within 24 hours, and it's best to wait for it to fully resolve before taking the next dose. The minimum amount of time to wait before the next dose is 48 hours, as long as the person is healthy at the time of the dose. Avoid taking any other homeopathy within 48 hours of taking homeoprophylaxis.

Avoid touching the HP pellets, as the medicines can rub off on your fingers. Instead, pour the vial into the cap and aim for roughly 2-4 pellets at a time. The exact number of pellets doesn't matter, but ideally, it's about 2-4. Dump the cap under your tongue and let them dissolve.

## HP Dosing:

Each dose is approximately 2-4 pellets. The first 2 days of dosing are the 200C potency and the last 2 days of dosing are the 10M potency. Keep in mind, you can space out these days of dosing as far apart as you'd like, but the minimum amount of time between dosing days is 48 hours.

**First Day of Dosing:** 200C given once in one day (wait at least 48 hours or longer before giving the next day of dosing, which must be of the same disease)

**Second Day of Dosing:** 200C three times in one day, like morning, noon and night (wa at least 48 hours or longer, then you can move onto the next disease, or continue dosing the same disease)

---

**Third Day of Dosing:** 10M three times in one day (wait at least 48 hours or longer before, then you can move onto another disease, or continue dosing the same disease)

**Fourth Day of Dosing:** 10M three times in one day (wait at least 48 hours or longer before giving a dose of another disease).

Remember, in terms of timing, the only thing that really matters, is that the person is healthy when taking a dose. If the person experiences a response, make sure to give enough time for the response to fully resolve before giving the next dose (a minimum of 48 hours later). Also, don't give a dose unless you can stay home with a potential immune response the next day. Plan this around your life and not vice versa.

## Choosing Dates:

Make sure to only use dates on the official record that correspond to the dates you took the homeoprophylaxis. That being said, be sure the COVID-19 vaccine is available to your particular population before using that date on the official record. Two doses of the vaccine are required, so only choose to use two dates, which are at least 1 month apart on the official immunization card. Enclosed are the COVID-19 CDC cards. The standard practice is for the health care provider to write the manufacturer, lot number and health care professional name on the card, and have the patient fill in the rest.

25.	The letter pictured above contained MAZI's name at the top and stated, in relevant part, as follows:

a.	"Homeoprophylaxis . . . utilizes the same underlying theory as vaccination, where introducing a very minute amount of this disease into the body creates immunity."

b.	"Four total days of dosing are required, before lifelong immunity is considered achieved."

c.	"Each dose is approximately 2-4 pellets.  The first 2 days of dosing are the 200C potency and the last 2 days of dosing are the 10M potency."

d.	"Make sure to only use dates on the official record that correspond to the dates you took the homeoprophylaxis.  That being said, be sure the COVID-19 vaccine is available to your particular population before using that date on the official record.  Two doses of the vaccine are required, so only choose to use two dates, which are at least 1 month apart on the official immunization card.  Enclosed are the COVID-19 CDC cards.  The standard practice is for the health care provider to write the manufacture, lot number and health care professional name on the card, and have the patient fill in the rest."

26.	On or about June 2, 2021, a consensually monitored and recorded telephone call was placed by Complainant 1 to MAZI's office for a prescheduled telephone appointment with MAZI.  After MAZI answered and identified herself, Complainant 1 stated that a family member referred her/him to MAZI.  Complainant 1 explained that family members purchased purported COVID-19 homeoprophylaxis immunization pellets from MAZI and stated that s/he wanted to know more about it.  MAZI made the following statements, which are quoted from a certified transcript that was made of the recording:

a.    "[I]t's called homeoprophylaxis . . . It is a branch of Homeopathy . . . it basically utilizes the same underlying theory that vaccination uses. And that theory is that we are introducing a very minute amount of this illness, into the system in a way that provokes immunity."

b.    "Now in nature, you know. The way that we typically catch these infectious diseases is by way of the germs entering in through one of our orifices. So with homeoprophylaxis, we are introducing these orally. And in doing so that automatically signals the immune system's attention, without the need for any other ingredients to accomplish that. Whereas of course with vaccines, because they're being injected, they're not coming in through one of the natural entry routes."

c.    "And ultimately with this method, there's 4 total days of dosing. The first two days are the lower dose, or the lower potency. And the last 2 days are the higher potencies. So we're kinda strategically teaching the immune system immunity to this disease."

d.    "Now…basically if the infectious disease exists, they can make a remedy from it. So there are remedies for pretty much every infectious disease you can imagine out there, whether or not there are vaccines for those diseases. So the remedy for Covid has been available since the beginning, and I've been offering that. And you know, it really wasn't until at least 9 months later that the CDC printed these cards."

e.    "[The CDC Vaccination Record Cards] so clearly state Vaccination Record, and ask for a manufacturer and lot number. So you know, I um even though it's more than an ethical stretch that I'm happy about, I am just stepping up to the plate to offer these."

f.    When Complainant 1 stated that it is "important to me [to receive the CDC Vaccination Record Card] because um you know. I want to be able to show that I'm vaccinated," MAZI responded, "Exactly. I know. It's becoming quite the climate."

g.     When Complainant 1 stated that "[t]his basically takes the place of a vaccine, like I wouldn't have to, I wouldn't need another one so that's perfect," MAZI replied, "Yeah, exactly."

h.     MAZI stated that children of Complainant 1 could receive the same dosage and that the "dose is actually the same for babies."

i.     MAZI also asked Complainant 1 if s/he was "interested in talking about the childhood diseases . . . for the [State of California] vaccine mandate."  MAZI stated that "the immunizations required for school" were also "something that I offer" in the form of homeoprophylaxis remedies.

27.     During the recorded call, Complainant 1 purchased from MAZI the purported COVID-19 homeoprophylaxis pellets via interstate wire for $243.00, using a credit card method of payment that was issued by Credit Card Company 1.  As discussed in greater detail below in this affidavit, this credit card payment was processed by Square in California using interstate wires to check the validity of Credit Card Company 1, which is located in Missouri and which utilizes authorization servers located in Kansas.  A follow-up appointment was scheduled in order for MAZI to explain the process prior to Complainant 1 ingesting the purported COVID-19 homeoprophylaxis pellets.

28.     On or about June 10, 2021, Complainant 1 received an envelope at her/his residence through the United States mail with a return address of Napa, CA."  The post mark was dated June 7, 2021, Oakland, CA.  The envelope contained a document titled "COVID Homeoprophylaxis" and four blank COVID-19 Vaccination Record Cards.  The COVID-19 Vaccination Record Cards were substantially similar to the ones provided to Complainant 1's family members, but did not have MAZI's name, a vaccine manufacturer, or lot number pre-written on the cards.  The "COVID

Homeoprophylaxis" document was substantially similar to the one MAZI provided to Complainant 1's family members and quoted above in Paragraph 25, but, unlike the earlier version, it did not contain MAZI's name and practice address on it. The COVID Homeoprophylaxis document instructed the recipient as follows: "Fill in Moderna as the manufacturer for dose 1 and dose 2 (as this is the safest of the vaccines types, so far). For the first dose, use lot#030M20A. For the second dose, use lot#022B21A." In this affiant's training and experience, fraudsters frequently attempt to conceal and disguise their scheme by removing their name from documentation that could identify them or connect them to the scheme.

29.     On or about June 17, 2021, a consensually monitored and recorded phone call was placed by Complainant 1 to MAZI's office for a prescheduled telephone appointment with MAZI. A male, believed to be "Office Manager 1," initially answered the call and transferred it to MAZI. MAZI thereafter made the following statements, which are quoted from a certified transcript that was made of the recording:

a.      "[Y]ou will basically fill in the card yourself . . . The only important aspect about the card is that it is legible. It does not matter whose handwriting it is in, and in most circumstances where they are having those like make-shift vaccination assembly line type situations, they are having people fill in the information themselves."

b.      "You will put my name, Dr. Juli Mazi . . . They want to see the dates are about one month apart or at least three weeks in between those dates . . . Ultimately, once you have the card completely filled out, I would highly recommend that you take a picture of it, and favorite that picture in your phone so you can find it quickly and easily."

c.      When Complainant 1 inquired about the contents of the pellets, MAZI stated: "[t]his is from the COVID-19 . . . It is made from the disease particles themselves. I do not

know the exact process for that . . . As long as they can extract germs of the virus, they can make the remedy.  With this method, we are tapping into what is known as the innate-immune system. That is like our higher intelligence part of the immune system.  A good example of that is how mothers transfer their immune intelligence to their babies.  You know any of those diseases or germs that mom was exposed to prior to pregnancy, all that information is inherited by the baby. That becomes the baby's innate-immune system.  So, that baby ends up having lifelong immunity to all that information without ever having to have been exposed to it in the first place. That is basically what this is tapping into, as well."

        d.      "The way that the vials are designed, you will unscrew the cap and you will pour roughly two to four pellets from the cap, and dump that under your tongue.  You do not have to drive yourself insane trying to pour exactly the four pellets.  The exact number of pellets it does not matter.  I mean it is like an energy medicine, so more pellets do not mean stronger necessary."

30.     Complainant 1 received the purported homeoprophylaxis immunization pellets in the mail from Distributor 1 on or about June 22, 2021.

**C.**     **Complainants 2 and 3**

31.     Complainant 2 made a complaint to the HHS-OIG hotline in or around May 2021. Complainant 2 reported that MAZI provided individuals with purported COVID-19 homeoprophylaxis immunization pellets and claimed that the pellets provided immunity to COVID-19.  In connection with the delivery of the pellets, Complainant 2 believed that MAZI also provided CDC COVID-19 Vaccination Record Cards because documentation that came with the pellets instructed customers how to fill out the card with false information to make it appear that the recipient had received an authorized vaccine.

32.     In the complaint, Complainant 2 included a copy of photographs of a document entitled "COVID Homeoprophylaxis" that s/he had received from her/his significant other. MAZI's contact information appeared at the top of the document; the language in the document appeared to be the same as or similar to the language in the document received by the family members of Complainant 1 and quoted above in Paragraph 25.

33.     Complainant 2 was interviewed by this affiant and stated that s/he learned about MAZI from Complainant 3, the significant other of Complainant 2.   Complainant 2 understood that Complaint 3's roommate had received from MAZI purported COVID-19 homeoprophylaxis immunization pellets, instructions on how to use the pellets, and a CDC COVID-19 Vaccination Record Card.   Complainant 2 had not seen the card, but had seen images of the "COVID Homeoprophylaxis" document, a copy of which Complainant 2 submitted to HHS-OIG.   The document, in part, claimed that the pellets provided immunity to COVID-19 and explained how to complete the COVID-19 Vaccination Record Card.   Complainant 2 expressed concern that the document appeared to give instructions on how to fill out the card to make it falsely appear as if the recipient had received an FDA-authorized vaccination, when in fact s/he had not.

34.     Complainant 3 was interviewed by this affiant.   Complainant 3 stated that a few days prior to the interview, her/his roommate reported that s/he had taken the first dose of the purported COVID-19 homeoprophylaxis immunization pellets and felt sick.   The roommate reportedly described her/his symptoms as gastrointestinal discomfort and an overall feeling of being unwell.   Complainant 3 read the document that the roommate said came with the pellets. The document explained how to fill out the COVID-19 Vaccination Record Card and included a statement about choosing a date that the recipient's population was eligible to receive the COVID-19 vaccine.

### D.    Undercover Recording

35.    On or about May 6, 2021, an undercover HHS-OIG agent contacted MAZI's office via telephone and recorded the call.  Office Manager 1 answered the call and communicated with the undercover agent.  Office Manager 1 advised that there are two COVID-19 homeoprophylaxis immunization pellet kits, one of which provides enough doses for four individuals and another that provides enough doses for 8 individuals.  Office Manager 1 further explained that each kit of pellets would include COVID-19 Vaccination Record Cards.  Office Manager 1 advised that the smaller kit cost $93 and a required follow-up visit cost $150.  Office Manager 1 stated that both visits would be held over the phone and, as discussed above, MAZI required Complainant 1 to participate in both visits.  Office Manager 1 stated that MAZI was very busy and that it takes weeks or months to schedule a visit.

### E.    Information Obtained from Government Agencies Regarding Vaccine Distribution

36.    Federal law enforcement agents obtained information from the CDC in connection with this investigation.  The information provided by the CDC establishes that MAZI has not signed a Vaccine Provider Agreement and therefore is not eligible to receive and administer the FDA-authorized COVID-19 vaccines.  CDC has no record of MAZI ever receiving or administering the FDA-authorized COVID-19 vaccines.

37.    Federal law enforcement agents obtained records and information pertaining to the Moderna lot numbers that MAZI wrote, or instructed her customers to write, on the COVID-19 Vaccination Record Cards.  Moderna's Vial Expiration Date website shows that the lot numbers 042L20A, 030M20A and 022B21A are real Moderna lot numbers.

38.    The California Department of Public Health ("CDPH") advised they have no record of MAZI receiving allocations of COVID-19 vaccines, and they have no record of any patients

who received FDA-authorized COVID-19 vaccinations from MAZI. CDPH provided detailed information on each location throughout the state of California that received Moderna vaccine doses from lot numbers 042L20A, 030M20A and 022B21A. A review of the information revealed no shipments to MAZI.

39.     CDPH records, however, revealed two shipments of 042L20A and one shipment of 030M20A delivered to an immunization clinic located at 2751 Napa Valley Corporate Drive, Napa, CA 94558. There was one shipment of 022B21A delivered to a pharmacy located at 4020 Bel Aire Plaza, Napa, CA 94558. The Napa County Health and Human Services Agency confirmed MAZI was not allocated doses of FDA-authorized COVID-19 vaccines. Additionally, the immunization clinic located at 2751 Napa Valley Corporate Drive, Napa, CA that received the three shipments of Moderna lot numbers 042L20A and 030M20A confirmed that it did not allocate any of those doses to MAZI.

**F.     Information Obtained From a Medical Expert at NIH**

40.     I spoke with a medical expert at the National Institutes of Health ("NIH") who serves as the National Institute of Allergy & Infectious Diseases (NIAID) Deputy Director for Clinical Research and Special Projects (NIH Expert 1). According to NIH Expert 1, MAZI's statement that her homeoprophylaxis immunization pellet kits would provide lifelong immunity is "absolutely a false statement." There is no known method that results in lifelong immunity to COVID-19. In regard to MAZI's claim that ingesting COVID-19 generates an immune response, NIH Expert 1 stated that (a) there is no data indicating with any degree of certainty that eating pellets containing COVID-19 results in a COVID-19 infection; (b) a mild case of COVID-19 is not likely to generate an effective immune response since data indicates that the more severe a case of COVID-19, the better the immune response; and (c) infecting members of the public with COVID-19 in order to generate an immune response risks spreading the disease and adverse health

19

outcomes, including death from COVID-19.  In regard to MAZI's claim that the FDA-approved vaccines contain toxicity, NIH Expert 1 stated that the vaccines have nowhere near the toxicity of COVID-19 and that the data on the FDA-authorized COVID-19 vaccines shows that they are quite safe, and only rarely side cause serious effects.

**G.      Information Obtained Regarding MAZI's School Immunization Scheme**

41.      In connection with this investigation, this affiant also uncovered evidence that MAZI's COVID-19 scheme was an expansion of a scheme involving purported homeoprophylaxis immunizations for other diseases, in addition to COVID-19.  This affiant is aware that California law requires all children enrolled in school in the state, both public and private, to have certain doctor-recommended immunizations.  This affiant also is aware that so-called "personal belief exemptions," were no longer permitted in California beginning on January 1, 2016.  Prior to that, parents could get out of vaccinating their children by filling out a form, signed by a health care provider, saying vaccines violated their personal beliefs.  Personal belief exemptions are not permitted because, as reflected in California law, the legislative history and purposes of the law, and information obtained from California public health agencies, when parents choose not to vaccinate their children, they put their children, and the community, at greater risk of severe vaccine preventable diseases.

42.      This affiant interviewed the former Attendance Secretary and Immunization Tracker ("Charter School Employee 1") at a charter school in Ukiah, California.  Charter School Employee 1 stated that s/he first became aware of MAZI when s/he received an immunization card for a student ("Student 1") in or about August 2020.  The card for Student 1 listed MAZI's name as the provider, and was unusual because it indicated a spacing of the immunizations that did not reflect the typical dosage regimen for the FDA-approved vaccines referenced on the card  On or about January 7, 2021, the parent of a different student ("Student 2") called to inquire whether the

purported homeoprophylaxis immunizations from MAZI would satisfy the state's immunization requirement. The parent stated that s/he hoped the school would accept MAZI's purported homeoprophylaxis immunizations because s/he had already paid MAZI. After consulting with the Mendocino Department of Public Health, Charter School Employee 1 informed the parent of Student 2 that the school was only able to accept FDA-approved immunizations and could not accept the purported homeoprophylaxis immunizations provided by MAZI. In or about February 2021, the parent of Student 2 provided Charter School Employee 1 with an immunization card from MAZI. The card listed MAZI as the provider, and was unusual because it did not contain all of the dates that the immunizations had purportedly been administered, which led Charter School Employee 1 to further question the parents of Student 2 as to the legitimacy of the card. The parents of Student 2 later presented Charter School Employee 1 with a letter from MAZI that listed the dates that certain immunizations were purportedly given to Student 2, but Charter School Employee 1 doubted the veracity of the letter because the dates listed by MAZI in the letter did not match the dates that were listed on the immunization card. Charter School Employee 1 then contacted MAZI to ask if MAZI provided FDA-approved immunizations or only homeoprophylaxis. MAZI replied via email and stated that she offered patients both homeoprophylaxis and FDA-approved vaccinations at her practice. Charter School Employee 1 believed that MAZI's statement was false and misleading because other families of students at the charter school stated to Charter School Employee 1 that MAZI offers only homeoprophylaxis immunizations. Charter School Employee 1's belief is consistent with evidence gathered in this investigation, which indicates that MAZI does not offer the FDA-authorized COVID-19 vaccines and falsely claims that vaccines are toxic.

## H. Financial Records

43. In connection with this investigation, this affiant became aware that MAZI used

Square, a digital payment company, for processing credit card payments.  Records obtained from Square indicated that MAZI had received approximately $221,817 in 1242 transactions from January 2020 to May 21, 2021.  The vast majority of the transactions did not contain a note indicating the purpose of the transaction.  However, there were 25 transactions amounting to $7,653 in this time period where notes in the transaction specifically indicated that they were for COVID treatments (and approximately 34 other transactions that noted that they were specifically for homeoprophylaxis treatment).  21 of the 25 specified COVID treatment transactions occurred in 2021, after FDA-approved vaccines had become available to the public.  As the vast majority of the transactions were for unspecified services, and the investigation revealed that MAZI primarily offers the service of homeoprophylaxis immunizations, in this affiant's training and experience it is likely that additional transactions and payments relate to the homeoprophylaxis scheme described in this affidavit.

44.     This affiant also is aware that Square partners with major credit card brands to process payments.  Information on Square's website states that when a merchant runs a customer's card, the request is submitted to Square.  Square then sends the transaction to the acquiring bank, which then sends it to the issuing bank for authorization.  The issuing bank is checking for sufficient funds.  It is also running the transaction through fraud models to determine if the transaction is safe (to protect the cardholder and the issuing bank).  This affiant also is aware that credit cards are issued by banks throughout the country and that computers are used in the authorization process such that when a defendant requests authorization with respect to a card, an interstate computer check is likely to follow.  As discussed above, Credit Card Company 1, which was used by Complainant 1 on June 2, 2021 to purchase COVID-19 homeoprophylaxis pellets

from MAZI, has indicated that its authorization servers utilized to approve Square transactions are located in Kansas.

## CONCLUSION

45.    Based on the above facts and based on my training and experience, I believe there is probable cause that MAZI engaged in a wire fraud scheme, in violation of 18 U.S.C. § 1343, and has made false statements relating to health care matters, in violation of 18 U.S.C. § 1035, in the form of materially false documents and writings on the CDC COVID-19 Vaccination Record Cards described above.

46.    I respectfully request that this Complaint, any warrant issued pursuant thereto, and any related records, be filed under seal until further order of the Court, as the investigation is ongoing.  An application and sealing order are filed concurrently with this affidavit and criminal complaint.

/s/ Victoria Schwarz
via telephone

_____
VICTORIA SCHWARZ
Special Agent
United States Department of Health and
Human Services Office of the Inspector
General

Sworn to before me over the telephone and signed by me this 13th  day of July 2021.

_____
HON. ALEX G. TSE
United States Magistrate Judge

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: [X] COMPLAINT  [ ] INFORMATION  [ ] INDICTMENT

[ ] SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

## OFFENSE CHARGED

18 U.S.C. § 1343 - Wire Fraud
18 U.S.C. § 1035 - False Statements Related to Health Care

[ ] Petty
[ ] Minor
[ ] Misde-meanor
[X] Felony

PENALTY:
18 USC §1343 – not more than 20 years imprisonment, not more than $250,000 fine, not more than 3 years supervised release, $100 special assessment.

18 USC §1035 – not more than 5 years imprisonment, not more than $250,000 fine, not more than 3 years supervised release, $100 special assessment.

### DEFENDANT - U.S

Juli Mazi

DISTRICT COURT NUMBER
3:21-mj-71156 MAG

**FILED**

Jul 13 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Victoria Schwarz, Special Agent, HHS-OIG

[ ] person is awaiting trial in another Federal or State Court, give name of court

[ ] this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

[ ] this is a reprosecution of charges previously dismissed which were dismissed on motion of:
[ ] U.S. ATTORNEY   [ ] DEFENSE
} SHOW DOCKET NO.

[ ] this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

[ ] prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form    Stephanie M. Hinds
[X] U.S. Attorney   [ ] Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    William Frentzen

## DEFENDANT

### IS *NOT* IN CUSTODY

1) [X] Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges

2) [ ] Is a Fugitive

3) [ ] Is on Bail or Release from (show District)

### IS IN CUSTODY

4) [ ] On this charge

5) [ ] On another conviction
} [ ] Federal [ ] State

6) [ ] Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

Has detainer been filed?   [ ] Yes   [ ] No
} If "Yes" give date filed

**DATE OF ARREST**    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**    Month/Day/Year

[ ] This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

[ ] SUMMONS   [ ] NO PROCESS*   [X] WARRANT    Bail Amount:

If Summons, complete following:
[ ] Arraignment   [ ] Initial Appearance

Defendant Address:

*\* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Date/Time:    Before Judge:

Comments: